UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————   Case No.1:18-cv-7004

ABDELIM AZAB,

$\qquad\qquad\qquad\qquad\qquad$ *Plaintiff*,   **SECOND AMENDED COMPLAINT**

$\qquad$ -against-   **JURY DEMAND**

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT ("NYPD") CHIEF OF INTELLIGENCE
BUREAU THOMAS GALATI, NYPD COMMANDING
OFFICER HOWARD REDMOND, NYPD LIEUTENANT
KARL PFEFFER, and NYPD SARGEANT PAUL BRISCOE,

$\qquad\qquad\qquad\qquad\qquad$ *Defendants*.

——————————————————————————

$\qquad$ Plaintiff Abdelim ("Abe") Azab ("Plaintiff" or "Azab"), by his attorneys, Ballon Stoll Bader & Nadler, P.C., complaining of Defendants, The City of New York ("Defendant City" or the "City"), New York City Police Department ('NYPD") Chief of Intelligence Bureau Thomas Galati ("Defendant Galati" or "Chief of Intelligence Bureau Galati"), NYPD Commanding Officer Howard Redmond ("Defendant Redmond" or "CO Redmond"), NYPD Lieutenant Karl Pfeffer ("Defendant Pfeffer" or "Lieutenant Pfeffer"), and NYPD Sergeant Paul Briscoe ("Defendant Briscoe" or "Sergeant Briscoe")   (collectively, "Defendants"), alleges upon information and belief:

**INTRODUCTION**

$\qquad$ 1. $\qquad$ This action seeks to vindicate the rights of the Plaintiff in the NYPD's Executive Protection Unit ("EPU"), a unit of the NYPD's Intelligence Bureau, whose promotions were delayed and denied solely based on his national origin and religion.

2.      This is an action brought for substantial compensatory damages and reasonable counsel fees premised upon the Defendants' continuing acts of unlawful discrimination, and harassment, based on Plaintiff's national origin and religion, for his marginalization, and the unlawful delay and denial to Plaintiff of promotion and benefits to which he is entitled, unlawful employment discrimination, and an unlawful hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 *et seq*.; the Executive Law of the State of New York, New York State Human Rights Law ("Executive Law"), § 296, *et seq*,; the Administrative Code of the City of New York, New York City Human Rights Law ("Administrative Code"), § 8-101, *et seq.*

## PROCEEDINGS TO DATE

3.      Plaintiff filed a charge with the EEOC against Defendants on February 16, 2018 complaining of discrimination on the basis of religion and national origin as alleged in this complaint.  The charge expressly alleged that the discrimination emanated from a policy and practice Defendants employed of not promoting detectives within Plaintiff's race and national origin and requested the EEOC investigate the matter as a systemic pattern and practice case.

4.      On June 22, 2018, the EEOC issued a right to sue letter under Title VII of the Civil Rights Act of 1964 against the Defendants. (Attached hereto as Exhibit 1).

5.      On November 2, 2018 Plaintiff amended his Complaint in the U.S. District Court for the Southern District of New York, and filed his First Amended Complaint.

6.      On November 26, 2018 Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint.

7.      On January 10, 2019, Plaintiff filed his opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.

8.     On or about December 20, 2018, after Plaintiff filed his First Amended Complaint, he was transferred from the EPU to the Dignitary Protection Unit assigned to Congressman Jerrold Nadler.

9.     This new assignment has greatly diminished Plaintiff's promotional opportunities and is yet another instance of Defendants' animus and discrimination towards Plaintiff.

10.     Furthermore, Plaintiff has not received a performance evaluation from his superiors since August 10, 2016.  As per NYPD labor rules P.G. 205.50 (28), a performance evaluation should be completed and finalized by January 31 of each year.

11.     This has effectively removed Plaintiff from consideration from any promotions.

12.     Plaintiff has recently filed a labor grievance to address Defendants' failure to give Plaintiff a performance evaluation.

## JURISDICTION AND VENUE

13.     This court has jurisdiction over Plaintiffs' federal claim pursuant to 28 U.S.C. §1331 and 42 U.S.C. §§ 2000-e5(f)(1),5(f)(3) and supplemental jurisdiction over the State and City law claims pursuant to 28 U.S.C. § 1367.

14.     As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this district pursuant to 28 U.S.C. § 1391 (a)(2).

## PARTIES

### *Plaintiff*

15.      Plaintiff is originally from Egypt and of Middle Eastern descent and is a Muslim.

16.     Plaintiff is a "person" within the meaning of Executive Law § 292(1), and within the meaning of New York City Administrative Code § 8-102(1).

17.     Plaintiff resides in Staten Island, New York.

*Defendants*

18.     Defendant City is a municipal corporation existing by virtue of the laws of the State of New York.   The City, through the NYPD, maintains a policy and practice of discriminating against non-white Muslims of Middle Eastern descent in the Intelligence Bureau. The City is liable for the discrimination Plaintiff suffered.

19.     At all relevant times herein, Plaintiff has been employed by the Defendant City through the NYPD.

20.     Defendant Galati is employed by the NYPD as Chief of Intelligence Bureau, whose command includes but is not limited to the EPU of the NYPD's Intelligence Bureau.

21.     Upon information and belief, Defendant Galati has supervisory authority over the personnel in the EPU; and, upon further information and belief, he is a key decision-maker as to personnel and staffing matters, including but not limited to recommending and approving NYPD detectives' promotions.

22.     Defendant Redmond is employed by the City's NYPD as the Commanding Officer of the EPU of the NYPD's Intelligence Bureau and Municipal Security Section.

23.     Defendant Redmond is responsible for daily operation of the EPU; and, upon information and belief is a decision-maker as to personnel and staffing matters, including but not limited to recommending and approving NYPD detectives' promotions.

24.      Defendant Pfeffer is employed by the City's NYPD as a Lieutenant assigned to the EPU.

25.     Defendant Paul Briscoe is employed by the NYPD as a Sergeant who was assigned to the EPU until in or about April 2018, when, upon information and belief, he was

transferred out of the EPU shortly after the NYPD received information that another detective, or other detectives, presently assigned to the EPU, had filed discrimination complaints with the U.S. Equal Employment Opportunities Commission (EEOC).

## JURY DEMAND

26.    Plaintiff hereby demands a trial by jury in this action.

## FACTS

### General Background on NYPD Ranks

27.    The lowest uniform rank within the NYPD is police officer.

28.    Any police officer who conducts investigative work for 18 months must be promoted to detective.

29.    A detective receives a coveted gold shield, additional opportunities, better assignments, as well as a substantial increase in compensation.

30.    Newly promoted detectives begin at the lowest grade – Third Grade Detective. Third Grade Detectives are eligible for promotion to Second Grade Detective, and then ultimately, to First Grade Detective.

31.    There is a tremendous difference in compensation and prestige between a Third Grade Detective and the most senior First Grade Detective. First Grade Detectives have base compensation levels over $30,000.00 above Third Grade Detectives and approximately $20,000.00 above Second Grade Detectives and are eligible for a similar compensation premium in their overtime, cash payments for unused vacation and compensation time, and retirement pensions.

32.    Upon information and belief, the difference in retirement pension money between a first and second Grade Detective is approximately $15,000 per year, for the life of that detective.

33.    First Grade Detectives are also provided opportunities for better training; are invited to formal social events within the NYPD; given additional opportunities for professional networking; and can earn significantly more in private practice upon retirement from the NYPD than lower-ranked detectives.

34.    Promotions within detective grades are recognized as major accomplishments, with announcements submitted to all commands within the NYPD.  Each promotion is recognized with a formal ceremony at NYPD headquarters, where the detective appears in full dress uniform in the presence of family and friends and personally receives the promotion from the NYPD Commissioner.

35.    Above the rank of detective are the supervisory ranks, starting with Sergeant, then Lieutenant, Captain, Deputy Inspector, Inspector, Chief, up to the Commissioner.

### Discrimination in the NYPD's Intelligence Bureau

36.    Based on Plaintiff's workplace experiences, the Defendants are culpable, upon information and belief, for promoting and condoning a pattern of systemic discriminatory practice upon protected classes of persons; and, upon further information and belief, the Defendants are culpable for promoting and condoning a pattern of systemic discriminatory practice based upon the religion and national origin of the Plaintiff; and Plaintiff falls within both the religion and national origin protected classes.

37.    While Plaintiff's claims of discrimination against Defendants are based upon his religion (Muslim)  and national origin (Egypt), upon information and belief, other examples of

the breadth of Defendants' systemic pattern of discriminatory practices are reflected by discrimination complaints recently filed with the EEOC by the following NYPD EPU detectives: Detective Lieutenant Francisco Rosado (national origin); Detective Keith Dietrich (age); Detective Erin Fitchett (race); and Detective Karl Rugg (age)—all of whom received Notices of the Right to Sue (in federal court) issued by the EEOC, and whose discrimination lawsuits are pending in this Court. In addition, EPU Detective Alex Pelepelin has filed an age and national origin discrimination lawsuit, which is pending in New York State Supreme Court, New York County (*Pelepelin v. The City of New York, et al.*, Index No. 154246/2018).

38.    Upon information and belief, the Rosado, Dietrich, Fitchett, Rugg, and Pelepelin discrimination lawsuits reflect Defendants' systemic pattern of discrimination against and harassment of City employees who belong to protected classes, including age, race, religion, and national origin.

39.    Upon information and belief, Mayor Bill DeBlasio has been regularly apprised of, and is aware of the EEOC complaints, Notices of the Right to Sue (in federal court) issued by the EEOC, and, generally, discrimination lawsuits brought by detectives in the EPU (as well as the NYPD's Intelligence Bureau), and particularly, the lawsuits filed by EPU Detectives Pelepelin, Dietrich, Fitchett, Rosado and Rugg.

40.    Nevertheless, upon information and belief, Mayor DeBlasio has not spoken out in a substantive manner about the above-mentioned EEOC EPU discrimination complaints (including Plaintiff's); nor, upon further information and belief, has he as Mayor of the City of New taken any affirmative steps to date to curb preferential assignments and preferential promotions that result from discriminatory practices, as alleged herein.

41.    Plaintiff has been employed by the City's NYPD since July 2001 when he was accepted into the Police Academy.

42.    In September 2003, Plaintiff became a detective.

43.    In 2008 Plaintiff was promoted to the rank of Second Grade Detective.

44.    Plaintiff has received no promotions since 2008.

45.    On or about January 31, 2003 Plaintiff was temporarily assigned to the Demographics Unit as an undercover detective investigator.  The purpose of this unit was to dispatch plainclothes detectives of Middle Eastern descent into predominantly Muslim neighborhoods, in order to build detailed files on the people in that community.

46.    During Plaintiff's time serving on Mayor Bill de Blasio's EPU, supervisory personnel and high ranking officers at NYPD included, but were not limited to Defendant Redmond (an Inspector), Defendant Pfeffer (a Lieutenant), and Defendant Briscoe (a Sergeant) (collectively, the "Individual Defendants"); and, upon information and belief, the Individual Defendants made derogatory comments directed at Plaintiff on a continuing and ongoing basis that reflect the continuous, ongoing discrimination, harassment, and hostile work environment that Plaintiff encountered.

47.    Upon information and belief, detectives in the EPU, who were not of Plaintiff's national origin or religion, and who were not in the protected categories of the EPU Detective EEOC Complainants, were not subjected to derogatory comments, a hostile environment, harassment, and discriminatory denial or delay of promotions by the Individual Defendants on a continuing and ongoing basis.

48.    An example of the ongoing and continuous discriminatory and harassing treatment directed at Plaintiff by Defendants, creating a hostile work environment, occurred on

January 1, 2014.  Inspector Redmond (who is white and not Muslim), approached a vehicle that Plaintiff was in with two other detectives. Inspector Redmond told Plaintiff and the other two detectives to "stay warm" in the vehicle and that "we'll see who's staying and who's leaving" on the Mayor's detail.  Since that time, the other two officers, who are both white and not Muslim, have been promoted.

49.     Another example of the ongoing and continuous discriminatory and harassing treatment directed at Plaintiff by Defendants, and the creation of a hostile work environment, is, upon information and belief, the animus Lieutenant Pfeffer has directed toward Plaintiff by making it known to Sergeants throughout the Unit, including Jerry Iovino and Roland Jerome, to keep "Abe (Azab) away from Eagle." Eagle refers to the Mayor.

50.     Furthermore, the examples articulated in paragraphs 48-49, herein, are also examples of the continuous and ongoing marginalization of Plaintiff by Defendants during his entire tenure at the NYPD's EPU.  Such marginalization has had a negative impact upon Plaintiff's promotional opportunities; i.e., the opportunities to be promoted from Detective Second Grade to Detective First Grade.

51.     Sergeant Briscoe has referred to Plaintiff as "useless" and a "misfit" on several occasions.  Such vulgar and derogatory characterizations of Plaintiff by Defendants, have occurred on a continuous and ongoing basis during Plaintiff's tenure at EPU, and they reflect the ongoing and continuous discriminatory and harassing treatment directed at Plaintiff by Defendants.

52.     In 2017, Sergeant Briscoe, well aware Plaintiff was within ear-shot, told the Lieutenant at City Hall "I'll send you one of the misfits." Sergeant Briscoe then proceeded to send Plaintiff to City Hall.  Such vulgar and derogatory characterizations of Plaintiff by

Defendants, have occurred on a continuous and ongoing basis during Plaintiff's tenure at EPU, and they reflect the ongoing and continuous discriminatory and harassing treatment directed at Plaintiff by Defendants.

53.    Throughout 2015, 2016 and 2017, Plaintiff was also removed from driving duties and was assigned to City Hall for most of the tours, upon information and belief, in order to isolate him from the rest of the EPU team, to create a hostile work environment, to harass Plaintiff, and to negatively impact his chances of being promoted, all because of discrimination based on his religion and national origin.

54.    On October 27, 2015, Plaintiff was assigned to escort the Mayor at a Queens Museum Event.  Lieutenant Pfeffer then proceeded to remove Plaintiff from his position and replace him with a different detective who was non-Middle Eastern and non-Muslim.

55.    On January 4, 2016 Plaintiff was assigned to help escort the Mayor to 1 Police Plaza for a meeting with the Police Commissioner.  Upon arrival, Lieutenant Pfeffer ordered Plaintiff back to City Hall with no explanation.

56.    On January 25, 2017, Plaintiff was assigned to drive the backup truck.  After driving for a few hours Plaintiff was removed by Sergeant Briscoe and placed once again at City Hall.

57.    On January 31, 2017, Plaintiff was assigned to the Mayor's detail at the gym. Immediately before arrival of the Mayor Sergeant Briscoe removed Plaintiff from his post and replaced him with a detective who is non-Muslim and non-Egyptian.

58.    On at least four occasions, Lieutenant Pfeffer or Inspector Redmond realized Plaintiff was driving one of the Mayor's vehicles and forced Plaintiff to pullover and immediately vacate the vehicle and replaced Plaintiff with another detective.

59.    Additionally, Sergeant Briscoe refused to give Plaintiff a car to use even though the Mayor's detail always has at least one extra car available.

60.    Despite Plaintiff's repeated and continued requests to Sergeant Vega-Valentine and Sergeant Hernandez for training, his last request was made in April 2017, Plaintiff was never offered any training, including but not limited to an FBI driving course, a U.S. Air Marshall training, and bodyguard training.  Because of this, Plaintiff's opportunities for promotion have been diminished.  Other non-Muslim and non-Middle Eastern EPU detectives have been afforded such training, greatly enhancing their qualifications.  Instead, however, training was offered to Katrina Brownlee, Christopher Fowler and Brian Roby, all of whom are non-Middle Eastern and non-Muslim, and two of whom have lesser experience and seniority than Plaintiff.

61.    Additionally, Plaintiff was withheld from advanced Dignitary training offered by the State Department while other detectives with less rank and seniority, who were non-Muslims and whose national origin was not Middle Eastern, were given this training.  This is despite the fact that Plaintiff has worked with protecting Dignitaries from 2004 to 2014.  Plaintiff has been on the unit protecting the royal family of Saudi Arabia, the King of Jordan, the Iranian President, and the Egyptian President.

62.    Additionally, there have been systematic attempts to isolate Plaintiff from the rest of the EPU.  For example, other detectives in the EPU have a steady schedule whereas Plaintiff never knew any of his assignments ahead of time.

63.    Plaintiff was not included in the Mayor's trip to Israel in October 2015 despite the fact that he is the only officer in the EPU that speaks Arabic and is a certified NYPD Linguist, and despite the fact that Plaintiff has worked with protecting Dignitaries from 2004 to 2014. This is yet another example of a continuous pattern of creation of a hostile work environment,

exclusion, marginalization, disparate treatment, and discrimination based on Plaintiff's religion and national origin.

64.    Defendant Redmond has not responded to Plaintiff's requests to discuss his discriminatory treatment.  However, Plaintiff was able to ask about his treatment when he met Inspector Redmond at City Hall in a brief meeting.  Defendant Redmond responded that Plaintiff is "too intimidating to people" and that Inspector Redmond would teach Plaintiff "dignitary in baby steps."  It is clear that Inspector Redmond used this as an excuse for discriminating against Plaintiff on the basis of his religion and national origin as there are other officers in the EPU who Inspector Redmond has stated "I love this guy he is so intimidating."

65.    The incidents described in paragraphs 51-64 reflect vulgar and derogatory characterizations of Plaintiff by Defendants that have occurred on a continuous and ongoing basis during Plaintiff's tenure at EPU, and they reflect the ongoing and continuous discriminatory and harassing treatment directed at Plaintiff by Defendants, on the basis of Plaintiff's national origin and religion; and they reflect the marginalization of Plaintiff that has negatively impacted on his opportunities for promotion.

66.    Only after Plaintiff filed his February 16, 2018 EEOC Charge was he offered training, whereupon Plaintiff received an email from Lieutenant Pfeffer that Inspector Redmond approved Plaintiff for FBI driving course training.

67.    Then, subsequent to Plaintiff's filing his original complaint, dated August 3, 2018, Plaintiff was informed he was approved for U. S. Air Marshall training.

68.    Plaintiff was given the opportunity to attend the Department of Defense Law Enforcement Officer Training Program in Virginia in August, 2018.  However, this was only

offered after Plaintiff filed his EEOC complaint, alleging national origin and religious discrimination.

***The Intelligence Bureau's Secret and Unstructured Promotion Process Is Discriminatory***

69.    The NYPD professes that promotions are the result of merit alone.

70.    The NYPD has no structured policy or procedure governing the promotions process for detectives.  The only written policy the NYPD has for promotions applies to how supervising officers evaluate the detectives they are supervising.  Supervising officers can recommend that a detective be promoted but they are not the ultimate decision-maker for that promotion.  That responsibility rests with Defendant Galati.

71.    The responsibility for making decisions as to promotions, also rested with former Deputy Commissioner Cohen during his tenure; and currently also rests with Deputy Director Miller.

72.    The NYPD does not publish when promotion decisions for Intelligence Bureau detectives will be made, who will participate in the decision-making process, or what weight, if any, supervisor recommendations will be given.

73.    Candidates for promotion are not told how many vacancies there are, who else they are competing against, or what criteria will be used to decide promotions.  Often, they are not even informed that they are being considered for promotion.

74.    In practice, promotions are the result of a highly subjective decision-making process, with decisions about advancement made in secret by all-white high level supervisors.

75.    Upon information and belief, religion and national origin play an impermissible role in all levels of the highly subjective promotions process.  From the beginning to end, the

process of being transferred into the Intelligence Bureau—and succeeding within it—is opaque and works against Muslims of Middle Eastern descent.

76.     Upon information and belief, promotions are made and have been made during the course of Plaintiff's employment with Defendants, on a monthly basis, wherein a ceremony is held on or about the last Friday of each month for the recipients of the promotion.

77.     Thus, non-Muslim, non-Middle Eastern Detectives who had less experience, less time in rank, and were otherwise less qualified than Plaintiff have been promoted, whereas Plaintiff has not been promoted.  For example, Katrina Brownlee, a non-Muslim, non-Middle-Eastern EPU Detective with less time in rank and who was not otherwise as qualified as Plaintiff, was promoted from Second Grade to First Grade Detective on December 22, 2017.

78.     In 2014, Plaintiff was selected to join the Mayor's Detail (EPU) and has been assigned to the EPU ever since.

79.     Since 2008, Plaintiff has not received any further promotions to First Grade Detective, although as set forth with greater specificity herein, other detectives, whose national origin is not Middle Eastern and whose religion is not Muslim, have been promoted from Second Grade Detective to First Grade Detective.

80.     Defendants' failure to promote Plaintiff from Second Grade Detective, which promotion was made in 2008, to First Grade Detective, while promoting other detectives, whose national origin is not Middle Eastern and whose religion is not Muslim, from second grade detective to first grade detective, reveals the fact that in practice, promotions are the result of highly subjective decision-making process, with advancement made in secret by high level supervisors who are non-Muslim and not of Middle Eastern descent.

81.     Plaintiff is aware that supervisor evaluations are directly connected to promotion decisions.  All detectives in the Intelligence Bureau should receive written evaluations from their direct supervisors at least once per year.   In the evaluation, supervisors rank detectives on various criteria on a scale of 0-5 and assess each detective's overall score of 0-5.  Supervisors, including but not limited to Defendant Redmond, also include written comments in the evaluations, including whether they recommend a candidate for promotion.

82.     Plaintiff has exhibited exemplary service during his tenure at the NYPD.

83.     Throughout his service to the NYPD, Plaintiff has consistently received performance ratings of 4.5 out of 5.0.

84.     Plaintiff has never had any disciplinary charges or proceedings brought against him.

85.     Upon information and belief, there are approximately 30 detectives in the EPU, and 26 of those detectives have been promoted.

86.     Upon information and belief, Plaintiff has 17 years of service in the NYPD and 9 years in rank, more than a significant number of the EPU detectives who have been promoted, all of whom are non-Muslim and non-Middle Eastern, and most of whom are younger and less qualified than Plaintiff.  Additionally, no detective second grade in the EPU has more time in rank than Plaintiff, except Detective Keith Dietrich.

87.     Four specific examples of detectives who were promoted with less experience and lower ranks include Detectives Katrina Brownlee, Teddy Wallace, Danny Rivera and Andre Holmes, all of who are non-Muslims and not from the Middle East.

88.     Upon information and belief, Detective Katrina Brownlee, a non-Muslim and non-Egyptian, had less time in rank (four years) than Plaintiff when promoted to detective first grade.

89.     Upon information and belief, Detective Teddy Wallace, a non-Muslim and non-Egyptian had less time in rank (three years) than Plaintiff when promoted to detective first grade.

90.     Upon information and belief, Detective Danny Rivera, a non-Muslim and non-Egyptian had less time in rank (three years) that Plaintiff when promoted to detective first grade.

91.     Upon information and belief, Detective Andre Holmes, a non-Muslim and non-Egyptian had less time in rank (six years) than Plaintiff when promoted to detective first grade.

92.     The next-level promotion for Plaintiff, from second grade detective to first grade detective, would carry with it a salary increase of approximately $16,000.00 per year without overtime, and up to $25,000.00, including overtime.

93.     Furthermore, such salary increase would entitle Plaintiff to enhanced retirement benefits.

94.     Upon information and belief, Defendants Galati and Redmond were decision-makers and instrumental in denying Plaintiff any promotion during his assignment to the NYPD's EPU.

95.     By their actions, including as described in paragraphs 69-94 herein, Defendants have created a hostile work environment in which Plaintiff has been harassed, denied promotion, and discriminated against on the basis of his religion and national origin.

96.     Pursuant to the continuous nature of Defendants' harassment of Plaintiff and discriminatory and disparate treatment of Plaintiff, annexed with Defendants' failure to promote Plaintiff on the basis of his religion and national origin, Plaintiff is entitled to the application of

the continuing violations doctrine to all violations alleged herein, as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

### DEFENDANTS' RECENT DISCRIMINATORY ACTS

97.    On or about December 20, 2018, after Plaintiff had filed his First Amended Complaint, he was transferred from the EPU to the Dignitary Protection Unit assigned to Congressman Jerrold Nadler ("Plaintiff's December 20th Transfer").

98.    John Miller, NYPD Deputy Commissioner of Intelligence, informed Plaintiff that his recent performance in EPU was satisfactory, and that his performance was not the cause of his transfer from EPU to his new assignment.

99.    Plaintiff's seniority within his new unit is much lower than his seniority was within EPU. As a result, Plaintiff has moved to the "back of the line" for promotion, i.e., he has lower in-unit priority for promotion in his new unit than he had in EPU, and his opportunities for promotion are much less than they were in EPU.

100.    Upon information and belief, the NYPD decision-makers who decided to transfer Plaintiff knew that his seniority in his new unit would be much lower than his seniority was within EPU, and that Plaintiff's opportunity for promotion would be much lower in the new unit than with the EPU.

101.    Furthermore, Plaintiff has not received a performance evaluation from his superiors since August 10, 2016.  As per NYPD Labor Rules P.G. 205.50 (28), a performance evaluation should be completed and finalized by January 31 of each year.

102.    Upon information and belief, NYPD's failure to give Plaintiff a performance evaluation has effectively removed him from consideration for any promotions.

103.    Plaintiff recently filed a labor grievance to address the failure to give him a performance evaluation.

104.    Upon information and belief, Plaintiff's December 20th Transfer out of EPU, and the failure to give him performance evaluations are intended to delay or prevent his promotion, are motivated by Defendants' discrimination against Plaintiff on the basis of his religion and national origin, and have contributed to the discriminatory, hostile work environment that Defendants have created in EPU.

105.    On or about December 20, 2018, two other EPU detectives, and one Lieutenant Commander, were also transferred out of EPU after they had filed EEOC charges, received the right to sue, and had filed lawsuits in this Court for discriminatory employment treatment by Defendants in EPU:    Detective Keith Dietrich, Detective Erin Fitchett, and Lieutenant Commander Francisco Rosado (one of whose claims included national origin discrimination).

106.    Upon information and belief, the Deputy Commissioner told Messrs. Dietrich, Fitchett, and Rosado, separately, that their performance in EPU was satisfactory; i.e., that their transfer was not a result of any deficiency in their performance.

107.    Upon information and belief, as with Plaintiff, the transfers of Dietrich, Fitchett, and Rosado out of EPU were intended to delay or prevent their respective promotions, and resulted from Defendants' improper, discriminatory motives.

108.    The transfers of Plaintiff and Dietrich, Fitchett, and Rosado out of EPU are a tacit admission that Defendants have created a hostile discriminatory work environment in EPU.

109.    The transfers of Plaintiff and Messrs. Dietrich, Fitchett, and Rosado out of EPU have further contributed to the hostile, discriminatory work environment that Defendants have created in EPU, in Plaintiff's case on the basis of his religion and national origin

110.     The transfers of Plaintiff and Messrs. Dietrich, Fitchett, and Rosado out of EPU have further contributed to the hostile, discriminatory work environment that Defendants have created in EPU and are further examples of the continuous, ongoing, and systemic employment discrimination that have prevailed in EPU and have harmed Plaintiff.

111.     Upon information and belief, no non-Egyptian or non-Muslim detectives or lieutenant-grade and above NYPD personnel – except for Dietrich, Fitchett, and Rosado (who have other discrimination claims) – have ever been transferred from EPU to Dignity Protection, or any other unit in the Intelligence Bureau.

## FIRST CAUSE OF ACTION
**(Unlawful Discrimination- Title VII, 42 U.S.C. § 2000 *et seq*. against the City of New York)**

112.     Plaintiff re-alleges and incorporates by reference herein paragraphs 1-111 as set forth above.

113.     Defendants are employers as defined in Title VII, and at all relevant times herein, employed Plaintiff.

114.     In violation of 42 U.S.C. § 2000-e2(a), defendants discriminated against Plaintiff based on religion and national origin by denying him promotions and therefore giving him less pay and rank as compared to less qualified detectives.

115.     This discrimination was a result of intentional actions by Defendants, deliberate indifference by Defendants, and /or the result of Defendants maintaining a policy or practice that has a disparate, harmful impact on Muslim/Middle Eastern detectives.

116.     Furthermore, by reason of the continuous nature of Defendants' discriminatory and disparate treatment of Plaintiff based upon his religion and national origin, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of

the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

117.    As a result of the Defendants discrimination, Plaintiff suffered and continues to suffer damages, including but not limited to lost income, mental anguish, and pain and suffering. They are also entitled to attorney's fees and costs and reduced pension benefits.

**SECOND CAUSE OF ACTION**
**(National Origin Discrimination- New York State Executive Law, § 296, *et seq*.**
**Disparate Treatment- New York State Claim against all Defendants)**

118.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-117 as set forth above.

119.    Plaintiff has been subjected to Defendants' disparate treatment on the basis of his national origin and religion in violation of the New York State Human Rights Law; Executive Law §296(1)(a).

120.    Furthermore, by reason of the continuous nature of Defendants' discriminatory and disparate treatment of Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

121.    As a result of Defendants discriminatory conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, diminution of pension benefits, and attorneys' fees.

122.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

**THIRD CAUSE OF ACTION**
**(National Origin Discrimination – New York City Administrative Code, § 8-101, *et seq*.**
**Disparate Treatment- New York City Claim against all Defendants)**

123.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-122 as set forth above.

124.    Plaintiff has been subjected to Defendants' disparate treatment on the basis of his national origin and religion in violation of the New York City Administrative Code §8-107, et seq.

125.    Furthermore, by reason of the continuous nature of Defendants' discriminatory and disparate treatment of Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

126.    As a result of Defendants discriminatory conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

127.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

**FOURTH CAUSE OF ACTION**
**(Hostile Work Environment- New York State Executive Law, § 296, *et seq*.**
**New York State Claim against all Defendants)**

128.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-127 as set forth above.

129.    Defendants NYPD, Redmond, Pfeffer, and Briscoe created a hostile work environment for Plaintiff, on the basis of his national origin and religion when they created an

objectively abusive work environment for Plaintiff, which altered the conditions of Plaintiff's employment, in an attempt to marginalize him from the EPU, in violation of New York State Human Rights Law; Executive Law §296(1)(a).

130.    Furthermore, by reason of the continuous nature of Defendants' creation of a hostile work environment for Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

131.    As a result of Defendants harassing conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

132.    As a result of defendants' harassing conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life; and has incurred and will incur damages thereby.

**FIFTH CAUSE OF ACTION**
**(Hostile Work Environment- New York City Administrative Code, § 8-101, *et seq*.**
**New York City Claim against all Defendants)**

133.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-132 as set forth above.

134.    Defendants NYPD, Redmond, Pfeffer, and Briscoe created a hostile work environment for Plaintiff, because of his religion and national origin when they created an objectively abusive work environment for Plaintiff, which altered the conditions of Plaintiff's employment, in an attempt to marginalize him within the EPU, in violation of the New York City Administrative Code 8-107(1)(a).

135.    Furthermore, by reason of the continuous nature of Defendants' creation of a hostile work environment for Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

136.    As a result of Defendants' harassing conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

137.    As a result of defendants' harassing conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life, and monetary damages including but not limited to legal fees; and has incurred and will incur damages thereby.

### SIXTH CAUSE OF ACTION
**(Failure to Promote- New York State Executive Law, § 296, *et seq*.
New York State Claim against all Defendants)**

138.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-137 as set forth above.

139.    Defendants NYPD, Redmond, Pfeffer, and Briscoe failed to promote Plaintiff, because of his national origin and religion, when they deliberately marginalized and refused to promote Plaintiff in violation of New York State Human Rights Law; Executive Law §296(1)(a).

140.    Furthermore, by reason of the continuous nature of Defendants' failure to promote Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

141.    As a result of Defendants conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

142.    As a result of defendants' conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life; and has incurred and will incur damages thereby.

### SEVENTH CAUSE OF ACTION
### (Failure to Promote- New York City Administrative Code, § 8-101, *et seq*.
### New York City Claim against all Defendants)

143.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-142 as set forth above.

144.    Defendants NYPD, Redmond, Pfeffer, and Briscoe failed to promote Plaintiff, because of his national origin and religion, when they deliberately refused to promote Plaintiff, in an attempt to marginalize him from the EPU, in violation of the New York City Administrative Code 8-107(1)(a).

145.    Furthermore, by reason of the continuous nature of Defendants' failure to promote Plaintiff, which persisted throughout the relevant periods mentioned hereinabove, Plaintiff is entitled to the application of the continuing violations doctrine to all violations alleged herein as the actions of Defendants continue to have an adverse and prejudicial impact on Plaintiff.

146.    As a result of Defendants conduct, Plaintiff has incurred, and will continue to incur, damages thereby, but not limited to back pay, forward pay, reduced pension benefits, and attorneys' fees.

147.    As a result of defendants' conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life, and monetary damages including but not limited to legal fees; and has incurred and will incur damages thereby.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, jointly and severally, awarding Plaintiff compensation and other damages in the form of back pay, front pay, and other monies and benefits unlawfully denied to Plaintiff, as well as for emotional distress, permanent damages to Plaintiff's emotional/mental well-being, loss of enjoyment of life, including pain and suffering, shame and humiliation.

1.    On the First Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial; and

2.    On the Second Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

3.    On the Third Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

4.    On the Fourth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

5.    On the Fifth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

6.    On the Sixth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

7.    On the Seventh Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages and attorneys' fees, in an exact amount to be determined at trial; and

That Plaintiff have such other, further, and different relief as the Court deem just, proper, and equitable in the circumstances, together with interest on all Causes of Action, attorney's fees, and costs and disbursements in this action.

Dated: New York, New York
       February 8, 2019

                                        BALLON STOLL BADER & NADLER, P.C.

                                        By:_____sMarshall B. Bellovin_____
                                               Marshall B. Bellovin, Esq.(MB5508)
                                               *Attorneys for Plaintiff*
                                               729 Seventh Avenue, 17th Floor
                                               New York, New York, 10019
                                               212-575-7900